## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Kenneth A. Austin, | : | Case No. 3:09CV723 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). Pending are the parties' Briefs on the Merits and Plaintiff's Reply Brief (Docket Nos. 11, 14 & 15). For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## I.  PROCEDURAL BACKGROUND

On March 22, 2006, Plaintiff filed applications for DIB and SSI, alleging that he had been disabled since October 15, 2003 (Tr. 52-55, 57-59). The application for DIB was denied initially and upon reconsideration (Tr. 45-47, 49-51)[1]. A hearing was conducted on September 3, 2006, before Administrative Law Judge (ALJ) J. Alan Mackay. Plaintiff, represented by counsel, and Vocational Expert (VE) Amy Vercillo appeared and testified (Tr. 609). On September 17, 2008,, the ALJ concluded that Plaintiff was not entitled to a period of disability and DIB (Tr. 16-23). The ALJ's decision became the final decision of the agency when the Appeals Council denied review on January 29, 2009 (Tr. 5-7).

---

[1]

It is unclear whether the application for Supplemental Security Income (SSI) was adjudicated.

An action in this Court seeking judicial review of the Commissioner's decision denying benefits was timely filed.

## II.  FACTUAL BACKGROUND

### A.    PLAINTIFF'S TESTIMONY

At the time of hearing, Plaintiff was 40 years of age and he weighed 143 pounds (Tr. 613-614, 624).  Plaintiff attained postsecondary training in cosmetology and served in the United States Navy until he had an automobile accident.  In the accident, he sustained broken legs, a concussion and amnesia.  After the automobile accident, he was comatose for three months. (Tr. 614-615).

Plaintiff claimed that he had persistent back pain during the majority of the day.  To avoid the onset of pain, Plaintiff would lie down (Tr. 616-617).  Plaintiff was prescribed Oxycodone; however, the side effect of this pain reliever was drowsiness (Tr. 625).

In 1990 or 1991, Plaintiff started having "blackouts" during which he was unconscious for up to fifteen minutes (Tr. 617-618).  He attributed the onset of the stream of unconsciousness to stress, extreme physical activity and heavy lifting (Tr. 618, 619).  Plaintiff claimed that he could not work as the blackouts occurred even while seated (Tr. 621).

Plaintiff was also subject to having headaches up to four times weekly.  The headaches affected his ability to concentrate or engage in functional activities.  The medication prescribed for the treatment of the symptoms caused drowsiness (Tr. 619-620).

Plaintiff was last employed as a barber.  Apparently he stopped work after he fainted while cutting a customer's hair (Tr. 619).  Plaintiff was placed through a temporary service at Hydramatic. where he worked in the order department (Tr. 633).

Plaintiff had difficulty walking and balancing with the "plate" and "rod" implants in his legs.

2

Plaintiff estimated that he could stand approximately thirty minutes occasionally (Tr. 615).  However, his ability to walk and stand was complicated by episodes of dizziness (Tr. 615, 620).  He walked with a cane and/or walker (Tr. 616).  He estimated that he could walk "about a half a block."  Sitting was equally difficult (Tr. 616, 621).  Unable to characterize his memory difficulty as short or long term, Plaintiff testified that he was forgetful (Tr. 620).

Plaintiff lived with his mother.  Apparently, she awakened him before leaving for work at 10:00 A.M.  Plaintiff was able to take care of his personal hygiene.  After that, he watched television, read, walked on the porch, talked to family and friends and then retired.  He estimated that he spent eight to ten hours daily in bed.  Occasionally, he vacuumed the floor.  (Tr. 623-624, 625).

### B.    THE VE'S TESTIMONY

After extensive questioning regarding Plaintiff's past relevant work, the VE, a certified vocational rehabilitation counselor for approximately twenty-five years, qualified Plaintiff's position of "stocker," as medium, unskilled work (Tr. 626, 631).  The VE classified Plaintiff's general office work as light and semiskilled (Tr. 634).

An individual of Plaintiff's age, education and work experience, limited to (1) standing and/or walking for a total of two hours in an eight-hour workday, (2) not climbing a ladder, rope or scaffold and occasionally climbing a ramp or stairs, (3) avoiding concentrated exposure to hazards, and (4) avoiding complex or detailed instructions, could perform work as a claims clerk or general office clerk (Tr. 634).  This hypothetical person would be able to perform unskilled light and sedentary positions such as order clerk, information clerk and billing clerk.  There were 1.2 million order clerk positions in the United States' labor market and 9,700 in the Ohio labor market.  With respect to the information clerk, there were 1.3 million jobs in the United States labor market and 34,000 jobs in the Ohio labor

market.  There were 1.2 million billing clerk jobs in the United States labor market and 16,000 in the Ohio market (Tr. 635).

In the alternative, if Plaintiff's testimony were credible, there were no occupations within his present capacity that would accommodate his impairments.  Plaintiff's ability to function throughout a normal workday doing an unskilled task and the number of sick days that Plaintiff would be required to take together with time spent in bed would not permit him to sustain unskilled work (Tr. 636).

### III.  MEDICAL EVIDENCE

In 1989, Plaintiff suffered a closed head injury resulting from an accident (Tr. 270).  After the accident, Plaintiff underwent an open reduction and internal fixation of the left tibia fracture.  On July 29, 2002, the hardware was removed from the left tibia (Tr. 257).  The attending radiologist, Dr. Farhad Ebrahim, noted in October 2006, that no left sided acute abnormality had resulted from the removal of the hardware.  The right side, too, showed no evidence of acute bone or articular abnormality (Tr. 551).

A computed tomography (CT) scan of Plaintiff brain's to detect  acute intracranial hemorrhage was performed on April 1, 2002 and was noted to be unremarkable  (Tr. 246).

On July 8, 2002, Plaintiff underwent treatment for a long-term bacterial infection of his toes (Tr. 388).

Plaintiff was prescribed physical therapy commencing on December 9, 2002 to strengthen and increase his range of motion and correct a dysfunctional gait (Tr. 367).  Plaintiff achieved only part of his goals because he failed to comply with the therapy schedule or attend all scheduled appointments (Tr. 365).        In February 2003, Plaintiff was treated for hyperlipidemia (Tr. 170).  On June 27, 2003, Plaintiff underwent a pacemaker implant (Tr. 228).  Plaintiff was diagnosed with syncope on June 28, 2003 (Tr. 157).

4

On June 16, 2004, Dr. Christopher Layne, Ph. D.,administered the Wechsler Adult Intelligence Scale (WAIS), the Wechsler Memory Scale (WMS) and the Wide Range Achievement Test (WRAT) (Tr. 97, 98). The results from the WAIS showed that relative to his mildly retarded intellect, Plaintiff showed no intellectual virtues or deficits (Tr. 97). The reading subtest results taken from WRAT showed a reading level consistent with grade seven (Tr. 98). Dr. Layne diagnosed Plaintiff with personality disorders and psychosocial environmental problems.

On June 23, 2004, Dr. William D. Padamadan, an internal medicine physician, opined that Plaintiff's pacemaker was permanent with no functional impairment (Tr. 103). Dr. Padamadan determined that Plaintiff's range of motion was normal in the cervical spine, shoulders, elbows, wrists, hips, knees, ankles and hands/fingers (Tr. 105,106, 107). The range of motion in Plaintiff's dorsolumbar spine was slightly less than normal (Tr. 106).

A psychologist, Dr. Robelyn S. Marlow, Ph.D., opined that Plaintiff had a moderate limitation in his ability to accept instructions and respond appropriately to criticism (Tr. 109). It was her opinion on July 2, 2004, that Plaintiff had a borderline intellectual functioning deficit and adjustment disorder with anxiety (Tr. 115, 116). The degree of functional limitations was mild to moderate in Plaintiff's ability to maintain social functioning. Otherwise, Plaintiff had mild limitations in activities of daily living or maintaining concentration, persistence or pace (Tr. 121).

Dr. Myung J. Cho reviewed the medical records and concluded on July 9, 2004, that Plaintiff had no exertional limitations. Plaintiff was limited in his ability to balance frequently or climb stairs occasionally (Tr. 126). No manipulative, visual, communicative or environmental limitations were noted (Tr. 126, 127).

On August 13, 2004, Plaintiff was involved in another automobile accident. Plaintiff sustained

5

a concussion and lumbar strain;  however, no acute intracranial abnormality was identified (Tr. 136, 138).

The results from the CT scan of Plaintiff's brain on January 25, 2005 were unremarkable(Tr. 322).  The x-ray of the lumbar spine administered on April 27, 2005 was normal (Tr. 147).

Plaintiff underwent a psychological evaluation on July 25, 2005 (Tr. 306).  Dr. Sunday Ilechukwu diagnosed Plaintiff with a depressive disorder, traumatic brain injury and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 309).

Plaintiff was seen for supportive counseling at the Veteran's Administration on June 27, 2005 (Tr. 315).

On March 8, 2006, Plaintiff was diagnosed with and treated for contact dermatitis (Tr. 159).

On June 16, 2006, Mr. Richard N. Davis, a clinical psychologist, diagnosed Plaintiff with an adjustment disorder, borderline intellectual functioning and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 242, 414).

Dr. Sushil M. Sethi conducted a clinical evaluation on August 8, 2006, after which he opined that Plaintiff's ability to do work related activities was slightly limited (Tr. 418).  Plaintiff's ability to raise his shoulder, elbows, wrists, fingers, hips, knees and feet against maximal resistance was normal (Tr. 419).  Moreover, Plaintiff's range of motion in his cervical spine, hips, shoulders, elbow, wrists and right ankle, hands/fingers was within a normal range.  The range of motion in Plaintiff's dorsolumbar spine, knees and left ankle were not within normal limits (Tr. 421, 422).

On March 27, 2007, a psychology intern at the Veteran's Hospital conducted an evaluation and diagnosed Plaintiff with a major depressive disorder evidenced by serious symptoms or a serious impairment in social, occupational, or school functioning (Tr. 524).

6

The echocardiography administered on May 4, 2007 showed mild aortic valve leaflet thickening and calcification (Tr. 425).  The CT scan administered on May 4, 2007, showed evidence of posterior displacement at L5 on S1 and mild disc bulge at L4/L5 (Tr. 439-440).

The attending psychologist found on July 3, 2007 that Plaintiff was depressed as a result of chronic pain (Tr. 493).

Dr. Ilechukwu noted cardiac arrhythmia on July 13, 2007 (Tr. 490).

On August 8, 2007, the examiner noted that Plaintiff's gait was extremely unsteady and he "ambulates stooped forward significantly" (Tr. 484).  Physical therapy was recommended for strengthening and stretching and for gait training (Tr. 485).

On September 12, 2007, Plaintiff received counseling at the Ann Arbor Veterans Administration Medical Clinic.  The licensed social worker determined that Plaintiff was distressed by financial stressors and unemployment (Tr. 474).

## IV.  STANDARD FOR DISABILITY

"The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920, respectively."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).

7

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations. 20 C. F. R. § 404.1520 (a)(4) (Thomson Reuters 2009).

First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(i) and 416.920(a)(4)(i) (Thomson Reuters 2009).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(ii) and 416.920(a)(4)(ii) (Thomson Reuters 2009).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §§ 404.1520 (a)(4)(iii) and 416.920(a)(4)(iii) (Thomson Reuters 2009).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(iv) and 416.920(a)(4)(iv)(Thomson Reuters 2009).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520 (a)(4)(v) and 416.920(a)(4) (iv) (Thomson Reuters 2009).

## V. THE ALJ'S FINDINGS

The ALJ made the following findings:

1.    Plaintiff met the nondisabilty requirements for a period of disability and DIB through the date of the decision or on September 17, 2008.

8

2.  Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.

3.  Plaintiff's traumatic head and leg injuries were considered severe based on the requirements of the regulations at 20 C. F. R. § 404.1520(c).  However, these medically deteminable impairments did not meet or medically equal the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  Plaintiff's allegations regarding his limitations were not totally credible for the reasons set forth in the body of the decision.

5.  Plaintiff, a younger individual between the ages of 18 and 44 with a high school education and no transferable skills from any past relevant work, had the residual functional capacity to perform less than a full range of light work but more than sedentary work.

6.  Using the medical vocational guidelines as a framework for decision making, there are a significant number of jobs in the national economy that Plaintiff could perform such as order clerk, information clerk and billing clerk.

7.  Plaintiff was not under a disability as defined under the Act at any time prior to September 17, 2008.

(Tr. 16-23).

## VI.  STANDARD OF REVIEW

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383 (c)(3).  *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 832-33 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*see Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.  'Substantial evidence' means 'more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept.'" *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (*citing Key, supra*, 109 F.3d at 273).

## VII.  DISCUSSION

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence.  Defendant contends that substantial evidence supports the ALJ's determination of no disability.

### 1.    IS THE VE'S TESTIMONY INCONSISTENT WITH THE DICTIONARY OF OCCUPATIONAL TITLES (DOT)?

The parties concur that the ALJ fulfilled his affirmative responsibility to inquire about DOT during the VE's testimony.  Plaintiff contends, however, that the inclusion of the information clerk position in a pool of unskilled jobs that would accommodate Plaintiff's impairments, was error.  Further, Plaintiff contends that the specific vocational preparation (SVP) of three for the information clerk position is consistent with semiskilled labor.

In response, Defendant directs the Court to *Lindsley v. Commissioner of Social Security*, 560 F.3d 601, 606 (6th Cir. 2009).  In this case, the Court found no violation of the regulations where the ALJ questioned the VE about conflicts and the VE said there were none.  Defendant argues that Plaintiff does not contend that the ALJ was aware of any error on the part of the VE, and it is too late now to resolve conflicts in occupational information.

The DOT's job classifications are collective descriptions of occupations that can encompass numerous jobs. *Beinlich v. Commissioner of Social Security*, 2009 WL 2877930, *3 (6th Cir. 2009).  The

10

DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. *Id.* (*citing* SSR 00-4p, *supra*). A VE may be able to provide more specific information about jobs or occupations than the DOT. *Id.*

The DOT lists a SVP time for each described occupation. DICTIONARY OF OCCUPATIONAL TITLES, Appendix C, page 1009 (4th ed. 1991). SVP refers to the "specific vocational preparation" level which is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* An SVP of three means "over 1 month up to and including 3 months." Using the skill levels designated in the regulations at 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 and semiskilled work corresponds to an SVP of 3-4. SSR 00-4p, at *3. An individual is able to perform semiskilled work only if he or she has transferable skills. 20 C. F. R. § § 404.1568(d)(1), 416.968(d)(1) (Thomson Reuters 2009).

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4p, 2000 WL 1898704, *2 (2000). When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. *Id.* At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. *Id.*

11

Here, the SVP designation of three altered the skill level for the information clerk job to semiskilled.  The Magistrate acknowledges that the ALJ did not recognize a conflict between the clerk positions, assess their respective skill levels or determine whether Plaintiff had transferable skills sufficient to engage in semiskilled work.  However, the Magistrate is reminded that the SVP of three represents the **maximum** requirement for occupations as generally performed, not the minimal requirements.  There is no evidence from which the ALJ would be compelled to find that Plaintiff could not perform a particular job in a specific setting even if it was designated as an SVP three job.  Reliance on the designation of an SVP under these circumstances, does not warrant reversal or remand since the VE was able to proffer substantial evidence of other significant work that exists in the national economy that will accommodate Plaintiff's impairments.

### 2.    DID THE ALJ ERR IN EVALUATING PSYCHOLOGIST'S REPORT?

Plaintiff contends that the hypothetical question posed to the VE and the adverse credibility finding were not supported by substantial evidence since the ALJ failed to evaluate the June 2006 report and opinion of Psychologist Richard Davis.  Defendant argues that since the report came six months after Plaintiff's date last insured and failed to address Plaintiff's condition prior to the expiration of the date last insured.  Moreover, the restrictions imposed by Mr. Davis were based on Plaintiff's subjective complaints.

It is well established that the opinions of consultative examiners are not entitled to controlling weight.  20 C.F.R. §§ 404. 1527(d)(2) and 416.927(d)(2) (Thomson Reuters 2009).  It is the duty of the ALJ to weigh the evidence of record.  *Richardson, supra*, 91 S. Ct. at 1426.  In weighing the evidence, the ALJ must determine if a plaintiff met the burden of proving that he or she was disabled on or before the last date on which he or she met the special earnings requirement of the Act.  *Jones v. Astrue*, 2009

12

WL 1270314, * 6 (S. D. Ohio 2009) (*citing Richardson v. Heckler,* 750 F.2d 506, 509 (6th Cir. 1984) (citation omitted); *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990)). Post insured status evidence of a claimant's condition is generally not relevant. *Id.* (*citing Bagby v. Harris,* 650 F.2d 836 (6th Cir. 1981); *see also, Bogle v. Secretary of Health and Human Services,* 998 F.2d 342 (6th Cir. 1993)). However, such evidence will be considered if it establishes that an impairment existed continuously and in the same degree from the date the insured status expired. *Id.* (*citing Johnson v. Secretary of Health and Human Services,* 679 F.2d 605 (6th Cir. 1982)).

Because the earnings record shows that Plaintiff's date last insured was December 31, 2005, Plaintiff must establish that he became disabled on or before that date (Tr. 60). To the extent that the consultative examiner was appointed by the Bureau of Disability Determination on June 16, 2006, to only conduct a clinical interview, his report is replete with Plaintiff's assessment of his condition on June 16, 2006. The report is not based on clinical tests. Nor does it offer any insight as to whether an impairment existed and to what extent it existed prior to the expiration of the insured status.

Even if the report were filed prior to the expiration of Plaintiff's insured status, Mr. Davis' report offers nothing probative to the evaluation of Plaintiff's credibility or residual functional capacity. Mr. Davis conducted a sole clinical interview. His report is a representation of what Plaintiff related during the interview.

    **3.**    **DID THE ALJ ERRONEOUSLY FAIL TO EVALUATE DR. LAYNE'S JUNE 2004 OPINIONS**?

Plaintiff contends that the ALJ erred in failing to acknowledge and evaluate the opinions of Dr. Layne, the state agency consultant, that Plaintiff was only able to follow oral instructions and that he could perform only simple, repetitive tasks such as assembly line work. Plaintiff further argues that there is no evidence that the three jobs offered by the VE accommodate only oral instructions.

Because state agency psychological consultants are experts in the Social Security disability programs, the rules in 20 C. F. R §§ 404.1527(f) and 416.927(f) require ALJs to consider their findings of fact about the nature and severity of an individual's impairments as opinions of nonexamining psychologists.  TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL, SSR 96-6P, 1996 WL 374180, *2 (1996).  Therefore, ALJs are not bound by findings made by state agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.  *Id.*  The ALJ must consider the findings of state agency psychological consultants as opinion evidence.  *Courtney v. Commissioner of Social Security,* 2009 WL 2949272, *2

Although the ALJ was not bound by Dr. Layne's finding, he clearly considered  Dr. Layne's opinions.  The ALJ explained that Dr. Layne's opinions were entitled to limited weight.  In arriving at his conclusion, Dr. Layne deviated from the traditional analysis, ignoring Plaintiff's physical ills unless influential on his mental functions, Plaintiff's refusal to use his skills and the ways that substance abuse affected Plaintiff's abilities.  This evidence is not definitive that Plaintiff could not perform the tasks associated with the clerk positions unless the instructions were administered orally.

The Magistrate does not address the second component of Plaintiff's argument as Plaintiff misconstrued Dr. Layne's finding.  Dr. Layne found that Plaintiff could sustain concentration.  Thus, he could attend to repetitive tasks such as assembly work.  This finding cannot be construed as a determination that Plaintiff was limited to only performing simple, repetitive tasks.

**4.       DID THE ALJ ERR IN FAILING TO EVALUATE DR. MARLOW'S JULY 2004 OPINION?**

14

Plaintiff argues that the ALJ failed to consider the opinions of Dr. Marlow, another state agency psychologist.

Plaintiff's assertion is correct.  The ALJ did not specifically mention that he considered the report of Dr. Marlow.  He did claim, however, that he considered the reports of all State agency physicians.  Even if the Magistrate found that the ALJ's consideration of Dr. Marlow did not comply with the regulations, Dr. Marlow's opinions are adverse to a finding of disability.  Dr. Marlow found that Plaintiff had substantially no significant or moderate functional limitations.  Moreover, Dr. Marlow commented that statements made by Plaintiff regarding his mental condition and limitations were not credible.  In Dr. Marlow's opinion, Plaintiff could follow simple instructions and he could work at a steady pace to sustain simple repetitive work.  Dr. Marlow was persuaded that Plaintiff had put forth little effort in taking the tests measuring his intelligence quotient; thus, the results were skewed (Tr. 108-122).  In summary, Dr. Marlow did not find that Plaintiff's impairments were of the severity to be disabling.  Remand for a discussion of Dr. Marlow's opinion and the weight attributed to such opinion would not alter the outcome of the ALJ's decision that Plaintiff was not disabled.

### 5.    DID THE ALJ ERR IN FAILING TO ACCURATELY ASSESS HIS EDUCATIONAL LEVEL?

Plaintiff argues that his numerical grade level is not dispositive of his educational level and that the ALJ improperly relied on Plaintiff's numerical grade level Plaintiff without considering other contrary evidence.  Plaintiff compares his circumstances to that of the plaintiff in *Skinner v. Secretary of Health and Human Services*, 902 F. 2d 447 (6th Cir. 1990).  If the ALJ in this case had relied on the WRAT results, as the court did in *Skinner*, he would have been led to a determination that Plaintiff cannot meet the educational requirements sufficient to perform work as an order, an information or a billing clerk.   The importance of the claimant's educational background may depend upon how much

15

time has passed between the completion of formal education and the beginning of the physical or mental impairments and by what the claimant has done with his or her education in a work or other setting.  20 C.F.R. § 404.1564 (b) (Thomson Reuters 2009).  Formal education completed many years before one's impairment began, or unused skills and knowledge that were a part of formal education, may no longer be useful or meaningful in terms of an ability to work. 20 C. F. R. § 404.1565(b)(Thomson Reuters 2009).  Therefore, the numerical grade level that the claimant completed in school may not represent his or her actual educational abilities.  20 C. F. R. § 404.1565(b) (Thomson Reuters 2009).  The term education also includes how well one is able to communicate in English since this ability is often acquired or improved by education.  20 C. F. R. § 404.1565(b) (Thomson Reuters 2009).

Plaintiff contends that his numerical grade level is no longer meaningful in terms of his ability to work as indicated by his WRAT results.  However, Plaintiff's comparison of the court's treatment of the WRAT results in *Skinner* is misplaced.  The plaintiff in *Skinner* was actually functionally illiterate, his WRAT test results relegating him to a third grade reading level.  He subsequently demonstrated that he read below the third grade level.  *Id.* at 448.  Under the medical vocational guidelines, the reduced educational level properly resulted in a finding that Mr. Skinner was disabled. In this case, Dr. Layne's opinion that Plaintiff was not motivated to complete the test detracts from the weight attributed to the WRAT results (Tr. 98).  Reliance on the WRAT results is not dispositive of Plaintiff's contention that his completion of high school may not be representative of his actual educational abilities.

### 6.     DID THE ALJ ERR IN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY?

Plaintiff argues that since the ALJ failed to specify his actual exertional capacities between the full ranges of sedentary and light work, substantial evidence does not support the ALJ's conclusion.

16

Under the analytical scheme established by the regulations, residual functional capacity is meant to describe the claimant's physical and mental work abilities. *Converse v. Astrue*, 2009 WL 2382991, *8 (S. D. Ohio 2009) (*citing Howard v. Commissioner of Social Security,* 276 F.3d 235, 240 (6th Cir. 2002)). Ordinarily, residual functional capacity is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting eight hours a day, for five days a week, or an equivalent work schedule. *Id.* (*citing* SSR 96-8p; *See* http://www.ssa.gov/OP Home/rulings/rulings.html, (emphasis in original) (footnote omitted)).

The regulations charge ALJs with the responsibility for assessing a claimant's residual functional capacity. *Id.* (*citing* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)). The claimant's residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, may cause physical or mental limitations or restrictions that may affect the claimant's capacity to do work-related physical and mental activities. *Id.* (*citing* SSR 96-8p)).

Within the body of the decision,  the ALJ found that Plaintiff had certain physical limitations that may affect his capacity to do work related physical or mental activities.  He did not include these limitations in the findings.  Specifically, the ALJ found that Plaintiff's maximum remaining ability to do sustained work activities was limited by his inability to climb ladders, ropes or scaffolds.  He could occasionally climb ramps and stairs.  Plaintiff was frequently unable to understand, remember or carry out complex or detailed instructions (Tr. 20).  Despite the positioning of the findings, the ALJ's administrative finding of Plaintiff's residual functional capacity is consistent with the analytical scheme of the regulations.

17

Plaintiff alleges that the ALJ failed to include these limitations in the hypothetical to the VE. This allegation is in error.  The ALJ posed the same exertional limitations that subsequently became the basis for his residual functional capacity analysis in a hypothetical (Tr. 634).

### 7.   DID THE ALJ ERR IN FAILING TO FOLLOW THE PRESCRIPTIONS FOR ASSESSING MENTAL IMPAIRMENTS?

Plaintiff argues  that he has a medically determinable mental impairment and that the ALJ failed to identify the signs and symptoms of his mental impairments and rate the severity of the mental condition with his activities of daily living, social functioning, concentration, persistence and pace and episodes of decompensation.

Pursuant to 20 C. F. R. § 404.1520a, the severity of mental impairments must follow a special technique.  Initially, the ALJ must evaluate pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment established by objective medical, clinical or laboratory evidence.  20 C. F. R. § 404.1520a (Thomson Reuters 2009); *Mullins v. Cohen*, 408 F. 2d 39, 40 (1969).  **If** the ALJ determines that a medically determinable mental impairment exits, **then** the ALJ must specify symptoms, signs and laboratory findings to substantiate the presence of the impairment and document findings including functional limitations that were considered in reaching a conclusion about the severity of the mental impairment.  20 C. F. R. § 404.1520a (Thomson Reuters 2009).

Initially, the record appears to be replete with evidence of a mental impairment.  However, prior to the expiration of Plaintiff's date last insured on December 31, 2005, there is a lack of substantial medical evidence from which the ALJ could find that Plaintiff had a mental impairment.  In 2003, Plaintiff claimed that he was depressed (Tr. 213).  Later he complained to Dr. Ilechukwu that he was

18

depressed, had low self esteem, insomnia and an inability to function (Tr. 171).  Observations were made during sessions at the psychiatric clinic that suggested that Plaintiff exhibited symptoms of restlessness and a mood disorder (Tr. 180, 235, 316, 335, 337-339).  On several occasions, Plaintiff was prescribed medication after he reported that he was depressed because of the psychological stressors (Tr. 196, 197, 198, 307, 309).  In October 2005, Plaintiff stopped taking the medication designed to treat depression (Tr. 301).  These highly subjective complaints and recitation of complaints by treating sources lack the laboratory or clinical basis to constitute medically determinable evidence of a mental impairment, the onset of which occurred prior to the expiration of his date last insured.

### 8.     DID THE ALJ FAIL TO EVALUATE PLAINTIFF'S USE OF A CANE AND WALKER?

Plaintiff cites as error the ALJ's rejection of the documented use of a cane and walker in assessing residual functional capacity.  In effect, Plaintiff asks that the Court find that the ALJ erred in failing to find that the cane and/or walker were medically required.

To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.  TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, *7 (1996).  The adjudicator must always consider the particular facts of a case such as if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, or whether the unskilled sedentary occupational base will not ordinarily be significantly eroded.  *Id.*

With this framework in mind, the Magistrate finds that in 2002, a cane was issued with the intent to correct Plaintiff's gait dysfunction (Tr. 280, 370).  In 2006, he requested a replacement cane (Tr. 568).

His use of the cane was documented in the medical records even after the expiration of his insured status (Tr. 374, 391, 484, 489, 499).  However, there is documented evidence does not reflect that Plaintiff needs a cane to stand or ambulate.  Nor does the evidence show a documented reliance on a cane. Consequently, the ALJ was not required to justify the impact of cane usage on Plaintiff's residual functional capacity.

> **9.     DID THE ALJ *DE FACTO* REOPEN THE 2004 APPLICATION?**

Plaintiff seeks judicial review of the Commissioner's decision denying Plaintiff's 2004 application.  Plaintiff suggests that since he refiled the application within four years, the Court should recognize a *de facto* reopening of his 2004 application.

Under the designated conditions for reopening, a determination, revised determination, decision, or revised decision may be reopened within four years of the date of the notice of the initial determination if there is good cause as defined in 20 C. F. R. § 404.989, to reopen the case.  20 C. F. R. § 404. 988 (Thomson Reuters 2009).  Good cause is found if new and material evidence is furnished, a clerical error in the computation or recomputation of benefits is made or the evidence that was considered in making the determination or decision clearly shows on its face that an error was made. 20 C. F. R. § 404.989 (Thomson Reuters 2009).

Plaintiff failed to overcome the designated barriers to reopening his 2004 case.  Specifically, he failed to demonstrate that new and material evidence exists, the administration made a clerical error in the computation of benefits or direct the court's attention to an error in the evidence.  In review of the entire record, there is no indication that the ALJ intended a *de facto* reopening of the 2004 case. Accordingly, the Magistrate is persuaded that this Court has no jurisdiction to review the actions of the Commissioner taken in the 2004 case.

20

## VIII.  CONCLUSION

For these reasons, the Magistrate recommends that the Commissioner's decision be affirmed and the referral to the Magistrate terminated.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   January 29, 2010


## IX.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

21